# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

WARREN McCOWAN, et al.,

      Plaintiff,

v.                                           Civ. No. 98- 581 WWD/LFG

ALL STAR MAINTENANCE, INC., et al.

      Defendants.


## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment, filed November 5, 1999 **[docket #55]**. Plaintiffs Warren N. McCowan ("McCowan"), Johnny P. Luna ("Luna") and Steve E. Guerrero ("Guerrero") (collectively, "Plaintiffs"), allege that All Star Maintenance ("All Star") and Timothy King ("King") violated their civil rights under 42 U.S.C. § 1981 and Title VII in allowing a racially hostile environment to exist and in terminating them because they are Hispanics.[1] Having considered all the pleadings, memoranda and other materials submitted by the parties, as well as the applicable law, I find that Defendants' motion is well-taken and will be granted.

## Background

During the latter end of July 1997, King hired Plaintiffs to paint the interior of houses at White Sands Missile Range for All Star Maintenance. Plaintiffs made up one of two painting crews under King's supervision. King reported to Charles Peterson, the project manager. All

---

[1] The Title VII claim is alleged against solely the employer, All Star Maintenance. Title VII applies only to employers. See Lankford v. City of Hobart, 27 F.3d 477 (10th Cir. 1994).

Star estimated that it should take a day for a three person crew to completely paint the interior of a house. In early to mid-August, just a couple of weeks after hiring Plaintiffs, All Star subcontracted some of the painting work out to two subcontractors so that it could compare the cost of hiring subcontractors to the cost of having its own crews do the painting.[2] All Star found that hiring subcontractors saved the company from $400 to $600 per house and that it was losing money on the painting work done by its own crews who were taking longer to finish a house.

Less than a month after hiring them, King told both painting crews that All Star would no longer use its own employees to do the painting and would subcontract the painting work. The subcontractor's painters are Hispanic. According to Defendants, after examining the backgrounds of the six painters, the painters in the second crew were rehired as general maintenance workers or laborers based on an examination. None of the three Plaintiffs were rehired.

Plaintiffs contend that Defendants' reasons for terminating them were pretextual and that they were terminated on the basis of their race. They also allege that they were subjected to a racially hostile work environment and that Defendants were aware of the derogatory comments which were made. Plaintiffs seek compensatory relief and punitive damages.

## Discussion

*Summary Judgment Standard*

Summary judgment should be granted where, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled

---

[2] These facts are undisputed. I note that Plaintiffs have ignored the requirements of D.N.M.LR-56.1(b), leaving Defendants' statement of facts undisputed. While this Court would be justified in finding for Defendants on this basis alone, I find that, despite Plaintiffs' self-styled narrative of facts, see Resp. at 3-8, Plaintiffs are unable to present any triable issues of fact, for reasons given in this opinion.

to judgment as a matter of law. The non-moving party must present enough evidence to allow a reasonable jury to find for the non-moving party, and cannot rest upon mere allegations or denials of the pleadings. Orback v. Hewlett-Packard Co., 97 F.3d 429, 432 (10th Cir. 1996) (citing Wilson v. Meeks, 52 F.3d 1547, 1551-52 (10th Cir. 1995)).

**Termination Claim**

Plaintiffs asserting racial discrimination in a termination claim under either Title VII or § 1981 must prove that they were discriminated against on the basis of race. Elements are identical for § 1981 and Title VII actions. Randle v. City of Aurora, 69 F.3d 441, 450 (10th Cir. 1995); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973). Under both theories, the ultimate burden of proof rests with the plaintiff to demonstrate that his employer intentionally discriminated against him because of his race or national origin. Aramburu v. Boeing Co., 112 F.3d 1398, 1403 n. 3 (10th Cir.1997).

A plaintiff may prove intentional discrimination in one of two ways, either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." EEOC v. Wiltel, Inc., 81 F.3d 1508, 1513 (10th Cir.1996) (citing USPS Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983)). Plaintiffs in this case allege discrimination on the basis of both direct evidence and pretext.

*Direct Evidence of Discrimination*

In support of their termination claim, Plaintiff offer evidence in the form of comments made by co-employees which they characterize as direct evidence of discriminatory intent. Direct evidence is evidence, which if believed, proves the existence of discriminatory intent, "without

inference or presumption."  <u>Shorter v. ICG Holdings, Inc</u>., 188 F.3d 1204 (10th Cir. 1999).  I

find that the litany of comments offered by Plaintiffs as evidence do not constitute direct evidence

of discrimination.

Several of the comments do not even by a stretch qualify as racially derogatory: co-

worker Steve Switzer calling Plaintiffs "f-----g painters" (<u>Defts' Ex. 1, Luna Statemt</u>.); the

ceasing of conversation among other employees when Plaintiffs entered the room to clock out for

the day, excluding them from conversation (<u>Pltffs' Ex. 1, 137:23 - 138:11</u>); or Switzer and King

allegedly referring to a co-worker from Brazil as "Duh" and "Idiot" (<u>Pltffs' Ex. 1, 211:17 -

212:13</u>.

The remainder of the comments made to Plaintiffs or overheard by them do not qualify as

direct evidence that Plaintiffs were terminated because they were Hispanic.  Rather, they are

statements of personal opinion which were made by other workers, not by an individual

responsible for making the hiring and firing decisions: (e.g., being called "burrito-eaters" or

"burrito-eating motherf-----s" by Switzer, <u>Pl. Ex. 1, 141:13-15</u>; Switzer responding with "Hey,

my stupid little Mexicans" when his assistant Joe Hernandez patted Switzer on the back and said

"Hello, my fine American friend," <u>Pl. Ex. 1: 134:1-6</u>; <u>cmp</u>., <u>e.g.</u>, <u>Furr v. AT&T Techs., Inc</u>., 824

F.2d 1537, 1547, 1549 (10th Cir. 1987) (holding that managers' statements that plaintiffs were

too old to learn new technologies and too old to be in supervisory positions were not direct

evidence of discrimination; rather, remarks were "specific instances of discriminatory statements"

from which the reasons for the adverse employment decision would have to be inferred), <u>cited in

Shorter</u>, 188 F.3d at 1207.   Comments reflecting personal opinion, even when reflecting a

personal bias or prejudice, do not constitute direct evidence of discrimination.  <u>See</u> <u>Heim v. Utah</u>,

8 F.3d 1541, 1546-46 (10th Cir. 1993); see also Ramsey v. City and County of Denver, 907 F.2d 1004, 1008 (10th Cir.1990).  Because the remarks were statements of personal opinion and not statements directly relating to Plaintiffs' termination, I conclude that Plaintiffs have failed to present any direct evidence of discrimination. Cmp., Perry v Woodward, 1999 WL 1256340 (10th Cir.N.M.1999) (as amended) (finding defendant's alleged comments to be "abhorrent and profoundly unprofessional" but that they did not represent "direct evidence that Perry's termination was the result of Woodward's alleged racism)".

*Indirect Evidence of Discrimination*

Plaintiffs also argue that circumstantial evidence supports their claim that Defendants intentionally discriminated against them on the basis of race.  This claim is evaluated under the McDonnell Douglas framework, where the plaintiff initially bears the burden of establishing a prima facie case of discrimination.  See Reynolds v. School Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir.1995), Shorter, 188 F.3d at 1208.  If the plaintiff establishes a prima facie case, the burden shifts to the employer to proffer a facially nondiscriminatory reason for the challenged employment action.  See id.  If the employer offers a nondiscriminatory reason, the burden shifts back to the employee to show that there is a genuine issue of material fact as to whether the employer's proffered reason is merely pretextual.  Randle, 69 F.3d at 451, cited in Shorter at 1208.

Plaintiffs are correct that the fourth element of a prima facie case does not require them to show that they were replaced by individuals in a non-protected group.  See Perry at 8; O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, (1996).  Plaintiffs may establish a prima facie case of wrongful termination by showing that: (1) they belong to a protected class; (2) they were

qualified for the job; (3) despite their qualifications, they were discharged; and (4) the job was not eliminated after discharge. Id. The fourth element of the prima facie test is also met with evidence of the seeking or hiring of a replacement to fill the position vacated by the discharged plaintiff who is a member of a group which has historically suffered discriminatory treatment. Id., see also Crawford v. Northeastern Okla. State Univ., 713 F.2d 586, 588 (10th Cir. 1983). In this case, I will assume without deciding that Plaintiffs have established a prima facie case of race discrimination in their termination and next consider whether Defendants have proffered a facially nondiscriminatory reason for the termination.[3]

Defendants characterize the switch to hiring subcontractors as "strictly a business decision." Peterson Dep. at 166: 7; King Dep. at 141:15-25 - 143: 1-5. In his deposition, King stated that he had set a performance standard or goal of "at least a house a day." Defts' Ex. 4 (King Dep, 58: 6-19). When neither of All Star's two painting crews was able to accomplish that objective, and neither proved to be profitable, All Star decided to hire subcontractors for a comparison and ultimately terminated both crews in favor of subcontracting the painting jobs. King Dep. at 143: 17-22; Defts' Ex. 5 (Peterson Dep., 164: 5-25). This evidence satisfies

_____

[3] In this case, Defendants preserve a challenge to the factual issue as to whether Plaintiffs were qualified as professional painters and question whether McCowan is actually Hispanic, since he stated initially that he was not. See Defts' Ex. 3, attachmt 6. Also, there is a question whether deciding to go with subcontractors instead of employees satisfies the purpose of the fourth prong, which is to "eliminate [one of the] two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." Perry at * 12.
    Presentation of a prima facie case does not entitle a plaintiff to go to trial. A defendant will still have the opportunity to dispel the inference by articulating a legitimate, non-discriminatory reason for terminating the employee. In meritless cases, the plaintiff will be unable to show that the employer's articulated reason is pretextual, and summary judgment will then be entered for the defendant. Id.

Defendants' burden to provide a legitimate, nondiscriminatory reason for the decision to terminate Plaintiffs. An employer's decision does not have to be wise, prudent or logical; it merely has to be explained clearly and applied indiscriminately. Tx. Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 252-56 (1981). Thus, for their claim to survive summary judgment, Plaintiffs must show that there is a genuine issue of material fact as to whether Defendants' proffered reason is a mere pretext for discrimination.

*Plaintiffs' Burden*

A plaintiff can establish pretext by showing "either that a discriminatory reason more likely motivated the employer. . . or that the employer's proffered explanation is unworthy of credence." Shorter, 188 F.3d at 1208 (citing Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir.1994) (quotation marks omitted)). To support their claim of pretext, Plaintiffs rely on allegations that they were performing their job satisfactorily at the time they were discriminated against and on circumstantial evidence such as co-workers' comments referred to above.

Plaintiffs assert that because they were doing good jobs and had been commended for their work, Defendants' proffered reasons for terminating them were pretextual. These assertions do not meet Plaintiffs' burden to demonstrate pretext. First, Plaintiffs' own work assessments are irrelevant. It is the "manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [his] own relative performance." Shorter, 188 F.3d at 1209. King stated in his deposition that Plaintiffs' work quality *was* a factor which was considered in the termination decision ("[w]hether they were sloppy and how they cleaned up, all that pertains to

job performance"). <u>Defts' Ex. 4, 143: 3-6</u>.[4]  Second, it matters little whether Plaintiffs' work

quality or speed was the real basis for the termination -- the fact that Defendants' proffered reason

was false does not necessarily mean that the true motive was the illegal one argued by Plaintiffs.

<u>See</u> <u>Randle</u>, 69 F.3d at 451 n.14 (10th Cir. 1995).  Similarly, whether there is any truth to

Plaintiffs' claims that their work was impeded by the substandard equipment they had to use or

that they were unfairly blamed for knocking holes in walls, <u>see</u> <u>Defts' Ex. 1 (attachment 1)</u>, has

little to do with Plaintiffs' claims of racial discrimination, as long as the reason they were fired

was not because they were Hispanic.

Despite Plaintiffs' collective assertions regarding work quality, there is no dispute that the

crew took longer to paint a house than the subcontractors did, falling short of the objective set

out by All Star. <u>Defts' Ex. 2 (Guerrero Dep. at 74: 13-22)</u> (taking longer than 2 days per house);

<u>Pltffs' Ex. 1 (McCowan Dep., 103:17-104:9)</u> (taking a day and a half).

Plaintiffs also make much of the fact that after both painting crews were terminated, All

Star rehired only members from the other crew as general maintenance workers or laborers.

Plaintiffs argue from a standpoint of virtual entitlement to employment at All Star, contending that

they also should have been rehired in other capacities.  While reassignments can be discriminatory

demotions if the employment decision adversely affects the plaintiff, <u>Hooks v. Diamond Crystal</u>

<u>Specialty Foods</u>, 997 F.2d 793, 799 (10th Cir.1993), <u>overruled in part on other grounds</u>,

<u>Buchanan v. Sherrill</u>, 51 F.3d 227 (10th Cir.1995), there is no provision in Title VII which

---

[4]  King stated under oath during an EEOC interview that he had a meeting with Plaintiffs
about a week after they were hired "about the amount of time taking to do the house" and that
their work quality was not as he had hoped.  They were "sent back to houses" to correct the
problems. <u>Pltffs' Ex. 5</u>.

mandates reassignment when termination does not result from a discriminatory practice.

Defendants decided whom they would rehire after examining the backgrounds, skills and experience of the individuals in both crews. An employer may use subjective judgment in its employment decisions and does not "need to litigate the merits of the reasoning" behind a business decision. EEOC v. Flasher Co., 986 F.2d 1312, 1321 (10th Cir.1992). Nor do Plaintiffs' own opinions as to their qualifications for rehire give rise to an inference of discriminatory intent regarding their termination. Cmp., e.g., Bullington v. United Air Lines, as: 186 F.3d 1301, 1317, n.13 (10th Cir. 1999).

*Circumstantial Evidence*

An examination of the page and a half of comments presented by Plaintiffs as evidence of Defendants' discriminatory intent reveals that there are actually few comments which could be considered circumstantial evidence from which an inference of illegal motive could be made. A few of the comments contain no suggestion of racial overtones ("f-----g painters"; calling another employee "Duh" or "Idiot") (Pltff's Resp. at 7, *items l, t*). Other comments were not directed at any of the Plaintiffs or not said in their presence, such as references by Switzer to Joe Hernandez as "nigger," "nigger for a day" or "south of the border friend"; Gorman's use of the word "nigger" (*items i, j, r*); Switzer's use of the word "spic" to refer to Hispanics (*item h*); McCowan overhearing "Oh shit, here comes one. There goes the neighborhood" (*item a); Switzer's reference to Hernandez as his "south of the border buddy" (*item q*); references to Hispanics as "cholos" (*item z*). A few of the comments are problematic as hearsay and double hearsay as presented (*items e, v, w*); see Gross v. Burggraf Const. Co., 53 F.3d 1531, 1540 (10th Cir. 1995) (Hearsay testimony cannot be considered because "[a] third party's description of [a witness']

supposed testimony is not suitable grist for the summary judgment mill.") (internally quoted case omitted).

Several derogatory comments were directed at Plaintiffs or indirectly included them: references by Switzer to the group as "stupid little Mexicans" and "south of the border friends" and "f-----g stupid Mexicans" (*items b, i, u*).  However, even though such comments may serve as circumstantial evidence of discrimination, Plaintiffs must still show some nexus between the statements and Defendants' decision to terminate them.  See Shorter, 188 F.3d 1204.  This nexus is lacking here.  Further, none of the comments were made by an individual who had the power to terminate them, thus King's alleged presence during three of the comments (*items g, i, x*) is irrelevant.  See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) ("In order to rely on [allegedly discriminatory] statements, [plaintiff] must show that they were made by a decision maker, and that there was a nexus between the discriminatory statements and the decision to terminate"), cited in Shorter, 188 F.3d at 1210.[5]

A review of the case law in this circuit persuades me that the circumstantial evidence which exists in this case is insufficient to rebut the presumption that Defendants terminated Plaintiffs for legitimate, nondiscriminatory reasons.   Cmp. e.g., Cone v. Longmont United Hosp.

---

[5]  Defendants raise the "same actor inference" which acknowledges that an individual who is willing to hire and promote person of certain class is unlikely to fire them simply because they are a member of that class, in order to raise an inference of non-discrimination.  See Buhrmaster v. Overnite Transportation Co., 61 F.3d 461, 464 (6th Cir. 1995).  Although it is undisputed that King had hiring authority, it is not clear whether he shared this authority with Peterson, the project manager.  Thus, the "same actor inference" may be inapplicable in this context.  See, e.g., Schindler v. Bierwith Chrysler/Plymouth, Inc, 15 F.Supp.2d 1054, 1058 (D.Kan. 1998) (refusing to apply "same actor" inference where individual who hired plaintiff was not the only person responsible for plaintiff's termination).

Ass'n, 14 F.3d 526, 530 (10th Cir.1994) (comments that "long-term employees have a diminishing

return" characterized by court as "stray remarks" insufficient to create a jury issue in ADEA

case); Hong v. Children's Memorial Hosp., 993 F.2d 1257, 1265 (7th Cir.1993) (in a Title VII

case, finding that supervisor's occasional comments that the Korean-American employee should

"learn to speak English" was insufficient to show discrimination and holding that supervisor's

occasional use of racial slurs directed at an employees' race "when unrelated to the decisional

process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when

such statements were uttered by a decision maker"), cited in Shorter at 1210; but, cmp.Tomsic v.

State Farm Mut. Auto. Ins. Co., 85 F.3d 1472, 1474, 1479 (10th Cir.1996) (holding supervisor's

statements supported inference of sex discrimination when supervisor told plaintiff she would not

succeed in training program, that she would lack incentive because her husband made too much

money, and asked about her marital relationship, while at the same time telling others that plaintiff

would be fired).

Isolated comments are insufficient to show discriminatory animus in termination decisions

if they are unrelated to the challenged action.  Shorter, 188 F.3d at 1209.   I find that Plaintiffs

cannot demonstrate the required nexus from any of the remarks made to an illegal motive in

terminating them.      I also find that Plaintiffs fail to present evidence of pretext as part of their

burden to show that discrimination played a part in the termination, and thus have not presented a

genuine dispute of fact requiring submission of this claim to a jury.

**At-Will Employment**

Defendants' contention that Plaintiffs cannot bring a § 1981 claim because they are at-will

employees can be disposed of summarily.  The Tenth Circuit has recently made clear that the

absence of a written contract is not fatal to a § 1981 claim and that an at-will employee can bring a § 1981 claim.  Perry at *4.[6]

**Retaliation Claim**

Defendants point out that Plaintiffs' retaliation claim was not exhausted and should not be considered by the Court.  However, a plaintiff may raise an unexhausted retaliation claim in court if it is reasonably related to the complaint.  Here, Plaintiffs are relying on the same discriminatory conduct allegedly suffered at the hands of Defendants as a basis for a retaliation claim, and thus may raise the claim here without having exhausted it administratvely.  See Ingols v. Thiokol Corp., 42 F.3d 616, *625 (10th Cir. 1994) (citations omitted).  What is more troublesome is that Plaintiffs did not raise the retaliation issue either in the complaint or in the submitted pretrial order.  It is presented in the summary judgment response for the first time, almost as an afterthought.  See R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc., 835 F.2d 1306, 1307 (10th Cir.1987)("a pretrial order measures the dimensions of the law suit, both in the trial court and on appeal").

Even if Plaintiffs' retaliation claim were timely presented, it would fail on its merits. The general approach to Title VII suits set out in McDonnell Douglas is also applicable to retaliation claims.  Sorensen v. City of Aurora, 984 F.2d 349, 353 (10th Cir. 1993).  A plaintiff must first establish a prima facie case of retaliation.  If a prima facie case is established, then the burden of production shifts to the defendant.  Id.  To establish a prima facie case of retaliation, a

---

[6] Defendants served its summary judgment motion on Plaintiffs before the Tenth Circuit filed the original Perry decision in August 1999.  However, other Tenth Circuit case law existed at the time which held that an employer can no longer terminate an at-will employment relationship for a racially discriminatory reason.  See, Hopkins v.Seagate, 30 F.3d 104, 105 (10th Cir. 1994).

plaintiff must show: "(1) he was engaged in protected opposition to Title VII or ADEA discrimination; (2) he was subjected to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action."

Plaintiffs' characterization of events is that they were terminated almost immediately after they approached King to complain about discriminatory comments which were being made. Pltffs' Ex. 1 (McCowan Dep., 210-211). Plaintiffs concede that they never complained to King prior to the day they were terminated, Defts' Ex. 4 (McCowan Dep.), 145: 10-15, although King states that Plaintiffs first came to him to complain the morning after he laid them off. Pltffs' Ex. 5.

However, even viewing the evidence in Plaintiffs' favor and assuming a prima facie case of retaliation exists,[7] the claim must fail because Plaintiffs cannot show the required retaliatory intent. See Purrington v. City of Utah, 996 F.2d 1025, 1033 (10th Cir. 1993) (mere causation is not enough, although it can be used to show inference of retaliatory motive). Plaintiffs' complaints to the EEOC were not made until a month after they were fired. See Pltffs' Exs. 6, 13, 16. And despite the alleged chronology of their termination in relation to their complaints of discrimination to King, there is ample evidence that Defendants had seriously contemplated

---

[7] An informal complaint to management qualifies as protected activity. Steinle v. Being Co., 1995 WL 285323 (D.Kan. Mar. 30, 1995), at *5, citing Phelps v. Sears Roebuck and Co., 1993 WL 523202 (10th Cir. Dec. 15, 1993), at *4; Rettiger v. IBP, Inc., 980 F.Supp. 1182, 1190) (D.Kan. 1997). Although the Tenth Circuit liberally defines "adverse employment action," Jeffries v. State of Kansas et al., 147 F.3d 1220, 1232 (10th Cir. 1998), the particular facts of this case leave a question whether Defendants' decision to hire out the painting jobs left a vacancy in Plaintiffs' jobs. The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive such as protected conduct closely followed by adverse action. See Burrus v. United Telephone Co., 683 F.2d 339, 343 (10th Cir.1982), cert. denied, 459 U.S. 1071 (1982). Plaintiffs' presentation of a time line could support the causal requirement.

switching to subcontractors because of problems with efficiency within 2 to 3 weeks after

Plaintiffs were hired and well before Plaintiffs had made any kind of informal complaint about

discrimination.  Defts' Ex. 5 (Peterson Dep.), 164: 15-25.  Because Plaintiffs have not presented

facts sufficient to rebut Defendants' reasons for termination or to sufficient create an inference of

retaliatory conduct, summary judgment will be granted to Defendants on this claim.

**Hostile Environment Claim**

Plaintiffs contend that they were exposed to numerous instances of racial harassment by

supervisors and co-employees and that Defendants acquiesced in this negative conduct.   In

support of this claim, Plaintiffs rely in part on the EEOC determination that there was "reasonable

cause" to believe that All Star permitted a hostile environment to exist.  However, an EEOC

determination is not adjudicative in nature and is therefore not binding on this Court.  See Atlantic

Richfield Co. v. U.S. Dept. of Energy, 769 F.2d 771, 787 n.107 (D.C.Cir. 1985); Moore v.

Devine, 767 F.2d 1541, 1551 (citing McClure v. Mexia Indep. Sch. Distr., 750 F.2d 396, 400 (5th

Cir. 1985)).

For a hostile environment claim to survive a summary judgment motion, "a plaintiff must

show that a rational jury could find that the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of

the victim's employment and create an abusive working environment."  Davis v. U.S. Postal

Service, 142 F.3d 1334, 1341 (10th Cir.1998), cited in Penry v. Fed'l Home Loan Bank of

Topeka et al, 155 F.3d 1257, 1261 (10th Cir. 1998).  A determination as to whether an

environment is "hostile" is made taking into account "the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc</u>., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).       However, viewing the alleged incidents "under the totality of the circumstances," <u>see</u> <u>Trujillo v. Univ. of Col. Health Sci. Center</u>, 157 F.3d 1211 (10th Cir. 1998),  I find that Plaintiffs have not made the required showing on the threshold issue of pervasiveness.  <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, --- U.S. ----, ----, 118 S.Ct. 2257, 2268 (1998) (viewing pervasiveness of conduct as threshold issue in determining whether discrimination in violation of Title VII can be proved under a hostile work environment theory).  For one thing, they ignore the broad context in which the offending comments were made, i.e., the context of a blue collar work environment.  <u>See</u> <u>Smith v. Northwest Financial Acceptance, Inc</u>., 129 F.3d 1408, 1414 (10th Cir. 1997)(emphasizing use of a broad contextual analysis).  It cannot be overlooked that construction work is perhaps one of the last bastions of a work environment where humor and language is commonly "rough hewn and vulgar."  <u>Gross v. Burggraf Construction Co</u>., 53 F.3d 1531, 1539 (10th Cir.1995) (acknowledging that speech that might be offensive or unacceptable in a prep school faculty meeting, or on the floor of Congress, is tolerated in other work environments).  As <u>Gross</u> notes, Title VII was not meant to "bring about a magical transformation in the social mores of American workers."  At 1538.

    As noted above in the discussion on Plaintiffs' discrimination claim, the majority of the comments cited by Plaintiffs as racially derogatory were either not directed at Plaintiffs or were told to them by a third party.[8]  For example, Plaintiffs were told by Joe Hernandez that Switzer said that he was a member of the Aryan Nation and had gone to prison after killing a black man

---

        [8]  McCowan stated in his deposition that Switzer called him and other Plaintiffs "burrito eating motherf-----s" but later conceded that he had overheard the comment as he walked into the room. (*items d, f, Pltffs' Resp.);* <u>cmp. Pltffs' Ex. 1, 141:13-15 with 157:17-21.</u>

and knifing a "spic" in prison.  Hernandez also passed along other remarks Switzer made about

Hispanics being "wannabe cholos."  Defts' Ex. 1, Luna Dep., 95:6.  Aside from the double

hearsay issue (as well as a question whether disclosure of Switzer's background constitutes racial

harassment), the fact that these insults were inadvertently overheard by Plaintiffs attenuates the

degree of animosity and severity of the harassment as alleged.  See, e.g., Witt v. Roadway

Express, 136 F.3d 1424, 1433 (10th Cir.1998); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415

(10th Cir.1987), cited in Penry, 155 F.3d at 1261 (evidence of general work atmosphere as well

as evidence of specific hostility directed toward the plaintiff . . . is an important factor in

evaluating a hostile environment claim).

More importantly, while the remarks which were made can be characterized as offensive,

Plaintiffs fail to show that the incidents formed a general work atmosphere which was sufficiently

severe so as to interfere with their work performance.  They do not dispute the fact that they

spent very little time either in the All Star office or among the other workers.  Defendants state

that Plaintiffs spent between 2 and 15 minutes in the office in the morning and about 2 minutes at

the end of the day to clock out, and participated in a weekly group meeting.   The vast majority of

their work was done alone in the houses they were painting.  Defts' Statemt. of Facts, ¶ 16).

Thus, aside from the fact that most of the comments were not directed at them, the limited

presence of Plaintiffs did not leave much opportunity for allegedly offensive remarks to become

pervasive.

Although a working environment dominated by racial slurs constitutes a violation of Title

VII, I find that Plaintiffs have not shown that their work environment was so "heavily polluted

with discrimination as to destroy the emotional and psychological stability of the minority

employee." Hicks, 833 F.2d at 1412.  Even assuming Plaintiffs' allegations to be true, the isolated

comments presented in support of the hostile environment claim are best characterized as "casual

comments, or accidental or sporadic conversation."  Id. (plaintiffs must prove "more than a few

isolated incidents of racial enmity"); accord, Bolden v. PRC Inc., 43 F.3d 545, 551 (10th

Cir.1994) (use of word "nigger" and Ku Klux Klan not pervasive enough); cmp., Daemi v.

Church's Fried Chicken, 931 F.2d 1379, 1385 (10th Cir.1991) (where employer told employee

that he was a "damn Irish" or "damn Iranian" and that if he wanted to keep his job he should get

rid of Iranians in his market, and where employer admitted openly that he disliked Iranians and

blacks, district court's finding that defendant's remarks did not unreasonably interfere with

plaintiff's work performance nor adversely affect his employment opportunities was not clearly

erroneous).  Because I find that Plaintiffs have raised no genuine issue of material fact as to

whether the cited remarks were sufficiently severe and pervasive to create a hostile work

environment, summary judgment should be granted to Defendants on this basis alone.

***Employer Liability for Hostile Environment*** [9]

Even if Plaintiffs had succeeded in showing that a hostile environment existed, Plaintiffs'

claim would still fail on the ultimate merits because they cannot make a case for All Star's liability

---

[9] In Burlington and Faragher v. v. City of Boca Raton, 118 S.Ct. 2275 (1998), the
Supreme Court recently paid special attention to the standard for vicarious liability for employers.
See Harrison, 158 F.3d at 1375 & Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1269
(10th Cir. 1998) (noting that Burlington and Faragher focused attention on employer liability for
hostile work environment created by a supervisor).  At the same time, the Supreme Court also
recognized "the continuing validity of negligence as a separate basis for employer liability."
Wilson v. Tulsa Jr. Coll. et al., 164 F.3d 534, n.4 (10th Cir. 1998) (citing Burlington, 524 U.S.
742, 118 S.Ct. 2257, 2267 (1998)).

under an agency theory. An employer is directly liable for a hostile work environment created by an employee if the employer's negligence causes the actionable work environment. Id. (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2267 (1998)); see also Harrison v. Eddy Potash, Inc., 158 F.3d 1371, 1374-75 (10th Cir.1998). An employer may also be vicariously liable for a supervisor's creation of a hostile work environment, subject to the affirmative defense "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." Burlington, 118 S.Ct. at 2270; Harrison, 158 F.3d at 1374. In this case, Plaintiffs have presented no facts which could form a basis of liability for All Star under either theory. Baty v. Willamette Ind., 172 F.3d 1232 (10th Cir. 1999).

*Negligence*

Plaintiffs do not dispute that neither King nor Peterson made any of the alleged comments.[10] Plaintiffs build their hostile environment claim on the contention that King and Peterson knew or should have known that a hostile work environment existed. See Hirschfeld, 916 F.2d 572, 576-77 (10th Cir. 1990); Burlington Indus., 524 U.S. 742. They further allege that both King and Peterson were present during the times some of the comments were made, that King laughed at some of them. For example, they claim that King was present when Switzer called Plaintiffs "burrito eaters," "burrito-eating motherf-----s" or "south of the border friends"; that King and Peterson were present and King laughed when Switzer said during a group meeting, "Hey my stupid little Mexicans" and that King laughed when Gorman commented "This ain't a law, it's a joke," when King put up an anti-discrimination poster. (*Pltffs' Resp., items b, d, i, l &*

---

[10] In his deposition, McCowan stated that King had made a comment when Plaintiffs were riding home with Joe Hernandez that "he didn't know we could fit that many of them in a car," but didn't know if was talking about painters or Mexicans. Pltffs' Ex. 1, 160: 12-22.

*n*).  These incidents, which I have already found insufficient  to constitute a pervasive atmosphere of harassment which altered the terms or conditions of Plaintiffs' employment, were also insufficient to put King or Peterson on notice.[11]

There is also no indication that King or Peterson were told or should have otherwise been aware of the existence of widespread racial harassment in the workplace.  <u>See</u> <u>Hirase-Doi v. US</u> <u>West, Inc., et. al</u>,  61 F.3d 777, 781-82 (10th Cir. 1995).  Plaintiffs did not complain about harassment by Switzer, Gorman, or any other co-worker until the morning they were terminated. The law requires reasonable care on the part of the employer, not heightened paranoia.  <u>See</u> <u>Jeffries v. State of Kansas</u>,147 F.3d 1220, 1230 (10th Cir. 1998) (absent a reason for suspicion, an employer is not required to engage in "an Orwellian program of continuous surveillance") (internal quotations omitted).

As support for its position that Defendants acquiesced in and had notice of harassing conduct, Plaintiffs maintain that King and Peterson were aware of Gorman's use of the word "nigger" and specifically a comment Gorman made about Stukes, a black employee, being a "worthless nigger," but that they failed to take any prompt remedial action until they knew Plaintiffs had filed an EEOC complaint regarding their own situation.  However, Gorman's conduct was never brought to the attention of either King or Peterson until after Plaintiffs were terminated.  <u>Pltffs' Ex. 1, 210</u>; <u>Pltffs' Ex. 7, 110:1-5</u>.  Not having had notice regarding Gorman's conduct at that time, King or Peterson had no reason to take any responsive action.

---

[11]  In fact, in his deposition, Hernandez stated that Switzer's comments were not made in All Star's offices and were not made in front of King.  <u>Defts' Ex. 9</u>.

Plaintiffs are correct that their EEOC complaint was pending when Gorman was terminated on November 7, 1997. By that time, however, All Star had known of the complaint for well over one and a half months. Pltffs' Ex. 3, 81:18-24. When King did become aware of a racially derogatory comment Gorman made after Plaintiffs had left All Star, he had Peterson respond formally to the problem. Defts' Ex. 5 (Peterson Dep.), 71-72; Pltffs' Ex. 12, 82:10-25. Thus, given the surrounding events, I find that Gorman's termination was not causally related to the pendency of Plaintiffs' EEOC complaint but rather merely coincidental.

There is also evidence that two verbal warnings were issued to Gorman prior to his termination (one before and one after Plaintiffs' own termination), but it is not clear if these warnings were based on similar conduct. Pltffs' Ex. 7, 111-112. Even if they were, Defendants' actions toward Gorman were still reasonable, since Gorman's termination would not have been required at that point in order to avoid liability under Title VII. See Adler v. Walmart Stores Inc.,144 F.3d 664, 676 (10th Cir. 1998). Thus, I find that no facts exist which create a triable issue regarding Defendants' liability for hostile environment under a negligence theory.

*Vicarious Liability*

Plaintiffs also attempt to hold All Star liable indirectly based on Gorman's conduct.[12] A person qualifies as an employer under Title VII if he serves in a supervisory position and exercises

---

[12]  Although an employer may be liable for acts of both supervisory and non-supervisory employees under a negligence theory, see Burlington, 118 S.Ct. at 2264, vicarious liability is premised on the use of authority -- e.g., as exemplified in § 219(2)(d) of the Restatement (Second) of Agency -- which is wielded only by a supervisor, or other person acting with the authority of the company. Burlington, at 2269, 2267 (acknowledging an employer can be held vicariously liable under Title VII if the harassing employee's "high rank in the company makes him or her the employer's alter ego"), cited in Harrison, 158 F.3d at 1376.

significant control over plaintiff's hiring, firing or conditions of employment. Despite Plaintiffs' references to Gorman as a "foreman" and "supervisor" who had the authority to "tell the painters what to do," there are no facts in this case which support Plaintiffs' characterization of Gorman as a supervisory employee. See, Sauers v. Salt Lake Cty., 1 F.3d 1122, 1125 (10th Cir. 1993). In his deposition, Peterson describes Gorman as "responsible for doing punch work, which meant that after the work was performed, he went back and corrected their incorrect work." Defts' Ex. 5, 49: 11-21. Plaintiffs do not dispute Defendants' statement of fact # 18 which describes Gorman as a "quality control person whose responsibility included checking to see if work was being satisfactorily completed." These actions do not qualify as "tangible employment actions" which "inflict direct economic harm." See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 2269 (1998).

Plaintiffs cannot establish All Star's liability through Tim King or Peterson. There is no evidence, and Plaintiffs do not dispute, that King or Peterson made any of the offensive remarks. Even assuming Gorman to have the status of a supervisory employee, Plaintiffs cannot prevail because they failed to report his conduct to either King or Peterson or otherwise avail themselves of All Star's complaint procedures until the morning they were terminated. Defts' Ex. 3 (McCowan Dep.), 145: 10-15.; see Burlington, 118 S.Ct. at 2270 (setting out employer's affirmative defense). Therefore, I find no dispute of fact which could support All Star's vicarious liability through either Gorman or King.

### Conclusion

In sum, Plaintiffs have not presented any dispute of fact to show that discrimination played a part in their termination or that their termination was a result of retaliatory conduct by

Defendants.  From the facts presented, Plaintiffs have not shown that remarks made by co-workers constituted harassment which was severe or pervasive enough for the hostile environment claim to proceed to trial.  Moreover, there are no genuine issues of fact which would support employer liability under an agency theory either through negligence or vicarious liability.  Accordingly, summary judgment is granted in favor of the Defendants.  A Judgment in accordance with this Opinion will be entered.

**WHEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment **[docket #55]** be, and hereby is, GRANTED.

UNITED STATES MAGISTRATE JUDGE