IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

WARREN N. McCOWAN, JOHNNY P.
LUNA, and STEVE GUERRERO,

    Plaintiffs,

vs.

NO. CIV-98-581-WWD/LFG

ALL STAR MAINTENANCE, INC.,
TIM KING, STEVE SWITZER, and
TRACY GORMAN,

    Defendants.

## DEFENDANTS ALL STAR MAINTENANCE, INC.'S AND TIM KING'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COME NOW Defendants All Star Maintenance, Inc. ("All Star") and Tim King ("King") and respectfully submit the following proposed findings of fact and conclusions of law:

### PROPOSED FINDINGS OF FACT

#### Background

1. All Star performed repair and maintenance of military family housing under the terms of a fixed price/indefinite quantity type contract at White Sands Missile Range in Alamogordo, New Mexico. All Star's contract was for a base period plus four one year options commencing May, 1997.



2. All Star's contract at White Sands Missile Range has expired. All Star is performing under monthly extensions to the contract and will cease performance under the contract on or about July 31, 2002.

3. Employees of All Star in Alamogordo perform a variety of maintenance tasks, including, without limitation, plumbing, heating and air conditioning, carpentry, roofing, electrical maintenance and repair, roofing, cabinetry, tiling, pouring concrete, landscaping, and the like. In the summer of 1997, before the function was sub-contracted to professional painters, they also painted the interior of houses at White Sands.

4. King began working for All Star in 1994. On or about June 1, 1997, All Star transferred King to White Sands Missile Range near Alamogordo, New Mexico to work as a field superintendent supervising approximately 30 employees.

5. Plaintiffs worked under the direct supervision of King.

6. Charles Peterson began working for All Star on June 30, 1997. Peterson worked for All Star for approximately a year and nine months as a project manager at White Sands Missile Range near Alamogordo, New Mexico. Peterson was King's supervisor.

7. Steve Switzer was hired as a carpenter. From time to time, he did other kinds of work at All Star. During the summer of 1997, Switzer worked at All Star pouring concrete.

8. Steve Switzer was not a supervisor or a manager at All Star, and did not supervise the Plaintiffs or any of the other painters.

9. Switzer resigned from his employment at All Star in May, 1999. When he resigned, his job title was "carpenter."

10. Tracy Gorman was hired by All Star as a carpenter. In the summer of 1997, Tracy Gorman worked at All Star doing carpentry and other work.

11. Tracy Gorman was not a supervisor or a manager at All Star and did not supervise the Plaintiffs or any of the other painters. King sometimes asked Gorman to check on the status of projects for him, to carry messages, and to confirm that all of the required work had been completed.

12. All Star terminated Tracy Gorman's employment on November 6, 1997 for using verbally abusive language. At the time of his termination, Gorman's job title was "carpenter."

13. Neither Steve Switzer nor Tracy Gorman had the authority to hire or to fire the Plaintiffs, nor did they have the authority to alter Plaintiffs' pay or the other terms of their employment.

14. King hired Plaintiff Warren McGowan ("McCowan") on July 21, 1997 to paint the interior of houses for All Star. King hired Plaintiffs Johnny Luna ("Luna") and Steve Guerrero ("Guerrero") on July 25, 1997 to paint the interior of houses for All Star. McCowan initially worked with a crew of three

other employees. When King hired Luna and Guerrero, McCowan joined them to form a new three man painting crew.

15. Plaintiffs were paid $11.41 per hour.

16. McCowan's Affirmative Action Voluntary Information Form was reviewed and approved by McCowan and indicates that he told All Star that his ethnicity was "White (not of Hispanic origin)."

17. As of July 25, 1997, All Star had two painting crews. The first crew was comprised of Guerrero, Luna and McCowan. The second crew was comprised of Michael Black, Frank Garcia and Troy Green.

18. Michael Black is African American. Frank Garcia is Hispanic.

19. Every employee hired by All Star is subject to a 90 day probationary period.

## Termination Claims

20. Pursuant to its contract with the government, All Star was paid approximately $1,000 to paint the interior of a house.

21. Based upon All Star's corporate experience, All Star determined that a three person crew of painters should paint the interior of a house at White Sands in one day or less.

22. Plaintiffs, as a crew, were unable to paint a house in one day or less.

23. On or about August 6, 1997, Peterson warned the Plaintiffs that they needed to look at their productivity. Tim King also warned Plaintiffs about their productivity.

24. Plaintiffs painted four houses during the three weeks they worked as a crew of painters at All Star. Plaintiffs took at least three days to paint each house.

25. All Star lost approximately $600, in labor costs alone, on each house Plaintiffs painted. All Star lost a total of $900 on each house Plaintiffs painted. All Star's labor and other costs for each house painted by Plaintiffs was approximately $1,900.

26. All Star also lost money on the houses painted by the second painting crew.

27. Because the painting crews took too long to finish the houses, King and Charles Peterson discussed whether All Star should continue painting with its own crews or whether painting work should be subcontracted.

28. King and Peterson retained a painting company, Jace's Quality Painting, on a trial basis, to determine whether a professional painting company could perform the painting work more efficiently.

29. All Star paid the subcontractor painters approximately $800 per house.

30. Because the subcontractor painters were more efficient, and because All Star was losing money on every house painted by Plaintiffs, Peterson and King decided to subcontract the painting work.

31. All Star subcontracted the painting work to two companies that employ all or mostly Hispanic painters.

32. On August 15, 1997, King notified Plaintiffs that All Star was going to hire subcontractors to do the painting and that they were being laid off.

33. All Star retained Frank Garcia, Michael Black and Troy Green to do other maintenance work. King and Charles Peterson chose to retain these three employees because they had demonstrated the skill and experience to do other available maintenance work. Luna, Guerrero and McCowan did not demonstrate such skills and, in the case of Luna and Guerrero, indicated to All Star that they did not possess those skills.

34. Guerrero was 25 years old in the summer of 1997. From 1992 through 1996, Guerrero worked as a salesman, and then a manager, at a tire store. From 1988 until 1992, he worked for Kentucky Fried Chicken. Prior to being hired by All Star, Guerrero had only worked for a total of four months as a painter.

35. In his Checklist of Skills submitted at the time of hire, Guerrero told All Star that he could not perform any plumbing, carpentry, roofing, tiling, drywall, carpeting or window work.

36. Luna was 23 years old in the summer of 1997. From 1995 until 1997, Luna worked at Fort Bliss, as a parts runner and briefly as a construction worker.

37. On his Checklist of Skills submitted at the time of hire, Luna, like Guerrero, told All Star that he could not perform any plumbing, carpentry, roofing, tiling, drywall, carpeting or window work.

38. McCowan was 24 years old in the summer of 1997. From 1990 until 1997, McCowan worked a variety of odd jobs, including restaurant work and work as a laborer and remodeler.

39. Michael Black, Frank Garcia, and Troy Green had demonstrated that they could perform other maintenance work.

40. Plaintiffs did not efficiently complete the painting work within the time required by All Star based on its contract with the government.

41. Neither King nor Charles Peterson made any racially derogatory remarks at the workplace.

42. Plaintiffs' job positions as painters were eliminated after they were terminated on August 15, 1997.

43. Plaintiffs knew on or about August 8, 1997 that they might be terminated.

44. All Star terminated Plaintiffs for good and legitimate business reasons.

45. Plaintiffs were not qualified to perform other available maintenance work at the All Star White Sands project.

## Hostile Work Environment Claims

46. Plaintiffs never complained about racial discrimination or racially derogatory remarks in the work place until after King notified them, on August 15, 1997, that they were being laid off.

47. When they complained, none of the Plaintiffs reported to King any specific act of discrimination.

48. When they complained, none of the Plaintiffs reported to King any specific conduct or action by a co-employee or supervisor.

49. Upon questioning from King on August 15, 1997, Plaintiffs refused to report, name or otherwise identify any specific act of discrimination or derogatory remarks, and they refused to identify any person making such remarks.

50. Plaintiffs themselves used racially derogatory language in the workplace. Plaintiffs called Tracy Gorman a "pinche cavacho."

51. Defendant All Star has a written policy prohibiting employment discrimination.

52. Plaintiffs never told Defendant King who they thought had discriminated against them or what remarks were made that they felt were derogatory.

53. Racially derogatory statements were not made in front of King or Peterson.

54. Racially derogatory remarks were not made by, or in front of, any supervisor at All Star.

55. Plaintiff's spent a vast majority of their time—about 95%—painting the interiors of houses, during which time they were virtually never in the presence of co-employees or a supervisor.

56. During a typical day, Plaintiffs arrived together, spent between two and fifteen minutes in the office, and then went to the house they were painting that day. For most of the day, Plaintiffs were alone in the house they were assigned to paint.

57. At the end of the day, Plaintiffs would clock out. It took Plaintiffs about two minutes to clock out.

58. Neither King nor Charles Peterson knew, or should have known, of Plaintiffs' claims of a hostile work environment.

59. All Star and King exercised reasonable care to prevent a hostile work environment at All Star.

60. Plaintiffs failed to take advantage of reasonable opportunities to seek corrective action or to avoid harm.

### Failure to Exhaust Administrative Remedies

61. Plaintiffs' Complaint was filed on May 15, 1998.

62. Plaintiffs' Complaint sets forth claims under Title VII and under 42 U.S.C. § 1981. Plaintiffs contend that they were terminated because of their race on August 15, 1997 (Compl., ¶¶ 12, 14, 19-26) and that they endured a racially hostile work environment (Compl. ¶¶ 17, 19-26).

63. On or about September 11, 1997, Plaintiffs each submitted a Charge of Discrimination to the EEOC ("EEOC Charge")  In the EEOC Charge, Plaintiffs each state that he has been "harassed by ethnically derogatory comments" and had been "discharged from" his employment.

64. Neither Plaintiffs' Complaint nor their EEOC Charges mention, allege, contend or state a cause of action for retaliatory discharge or discriminatory failure to hire.

## Plaintiffs' Alleged Damages

65. Since their termination, none of the Plaintiffs have consulted or have been treated by a psychologist, psychiatrist or other mental health care provider.

66. On September 25, 1997, Luna received and accepted an offer of employment at a salary of $10.00 per hour, 40 hours per week.

67. Luna began working on or about October 31, 1997, less than three months after he was laid off.

68. Luna currently is working at Fort Bliss in El Paso earning $15.50 per hour.

69.  Luna received $2,080 in unemployment benefits.

70.  Guerrero began working full time for Wal Mart beginning in the spring of 1998 earning $6.50 per hour. Beginning in 1999 and until June, 2001, Guerrero worked at Argyule Welding Supply earning $9.10 per hour.

71.  Guerrero has been working at Premier Distributing since June, 2001 earning $26,000 per year, or about $12.50 per hour.

72.  Guerrero received $4,550 in unemployment benefits.

73.  After being laid off, McCowan started his own remodeling company.

74.  McCowan received $2,250 in unemployment benefits.

75.  Since he was terminated at All Star, McCowan has been self employed and has worked at Inter Mountain Color since November, 2000 earning $7.00 per hour.

76.  All Star and Defendant King did not engage in any discriminatory practice with malice and did not act with reckless indifference to the rights of the Plaintiffs.

## Miscellaneous

77.  In 1995, Plaintiff McCowan was convicted in Louisiana of a felony drug charge. McCowan pled guilty to possession with the intent to distribute 30 pounds of marijuana. McCowan was placed on probation for a period of five years and paid a $10,000 fine.

78. Prior to filing suit, Plaintiffs told Joe Hernandez, another employee at All Star, that if "we all go along, then we all will get some money." Plaintiffs later asked Hernandez whether he still wanted "to go along with this," meaning whether they wanted him to help them win a substantial sum of money.

79. King has not been sued for discrimination at any other time or in any other case.

80. King terminated Tracy Gorman after receiving and investigating reports that Tracy Gorman had used racially derogatory language in the workplace.

## PROPOSED CONCLUSIONS OF LAW

### Termination Claims

1. Plaintiffs bear the initial burden of establishing a prima facie case of racial termination or retaliation. <u>Trujillo v. Grand Junction Regional Ctr.</u>, 928 F.2d 973, 977 (10th Cir. 1991).

2. Plaintiffs must show they were members of protected class, were qualified, were discharged despite adequacy of work and their jobs were not eliminated. <u>Id</u>.

3. Once an employee establishes a prima facie case, the burden shifts to the employer to come forward with a non-discriminatory reason for its decision. If the employer does so, the burden then shifts back to the employee to show the proffered reason was pretextual. <u>Id</u>.

4. Plaintiffs have not made a prima facie case of discrimination because their positions were eliminated after August 15, 1997.

5. Plaintiffs have not made a prima facie case of discrimination because they were not qualified as painters for military family housing in accordance with All Star's contract with the federal government.

6. When all four disparate treatment elements or all three retaliation elements are present, an employer is not liable if it can show that the employment decision was based on legitimate, non-discriminatory considerations. Tex. Dep't Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).

7. All Star had legitimate, nondiscriminatory business reasons for terminating the Plaintiffs on August 15, 1997.

8. All Star terminated the Plaintiffs on August 15, 1997 for business and financial reasons.

9. In order to establish pretext, Plaintiffs must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's ... reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).

10. All Star's reasons for terminating Plaintiffs are not implausible, inconsistent, incoherent or unworthy of credence.

11. All Star's proffered reason for terminating Plaintiffs is not pretextual.

12. There is insufficient direct evidence of discrimination to support Plaintiff's termination claims.

### Hostile Work Environment Claims

13. In order to prevail on a hostile work environment claim, Plaintiffs must show that, under the totality of the circumstances, they were exposed to a workplace "permeated with 'discriminatory intimidation, ridicule , and insult ... sufficiently severe or pervasive to alter the conditions of [their] employment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

14. The totality of the circumstances may include whether a derogatory remark was directed at the employee or merely overheard by the employee. Witt v. Roadway Express, 136 F.3d 1424, 1433 (10th Cir. 1998).

15. The totality of the circumstances may include whether the alleged statements were made by a supervisor or a fellow employee, Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2291 (1998).

16. The totality of the circumstances may include the real world in which the remark or conduct took place. See, e.g., Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1003 (1998) Gross 53 F.3d at 1537

17. If the nature of an employee's environment, however unpleasant, is not due to [race]," no hostile environment claim exists. Penry v. Fed. Home Loan Bank, 155 F.3d 1257, 1263 (10th Cir. 1998).

18. Plaintiffs must demonstrate that they were subjected to "a steady barrage of opprobrious racial comments." Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994).

19. Supervisory status requires proof that an individual has the power to take actions that have direct economic impact on an employee, actions such as hiring, firing, or withholding pay. See Burlington Indus. Inc. v. Ellerth, 118 S. Ct. 2257, 2269 (1998).

20. All "harassment cases ... require[] careful consideration of the social context in which particular behavior occurs and is experience by its target." Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1003 (1998).

21. In a case involving remarks made by co-workers, employers may be liable for a racially hostile environment only if "they fail[] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074 (10th Cir. 1998)

22. If "the plaintiff unreasonably failed to avail [himself] of the employer's preventive or remedial apparatus, [he] should not recover damages

that could have been avoided if [he] had done so." Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2292 (1998).

23. Under the totality of the circumstances, Plaintiffs' work environment was not severely or pervasively affected so as to alter the conditions of their job.

24. Plaintiffs were not exposed to a steady barrage of racial comments.

### Failure to Exhaust Administrative Remedies

25. Federal courts lack jurisdiction to entertain Title VII claims unless such claims were previously filed with the [EEOC]. Seymore v. Shawver & Sons, 111 F.3d 794, 799 (10th Cir. 1997).

26. Here, the alleged retaliatory act, Plaintiffs' termination, occurred before they filed their charges with the EEOC and, therefore, have not been administratively exhausted.

27. Plaintiff did not assert a retaliation claim or a failure to hire claim in the Complaint or the PreTrial Order.

28. Plaintiffs cannot assert a new claim omitted from both the Complaint and Pretrial Order, which measures the dimensions of the lawsuit, both in the trial court and on appeal. See R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc., 835 F.2d 1306, 1308 (10th Cir. 1987).

**MICHAEL BEST & FRIEDRICH, L.L.P.**
By: David W. Croysdale, Esq.
100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin 53202
Telephone: (414) 271-6560

-and-

**RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.**

By: _____
Charles J. Vigil
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone: (505) 765-5900
FAX: (505) 768-7395

*ATTORNEYS FOR DEFENDANTS ALL STAR
MAINTENANCE, INC. and TIM KING*

CERTIFICATE OF SERVICE

I hereby certify that I have caused to be mailed a true and correct copy of the foregoing pleading to the following counsel of record on April 22, 2002:

Angel L. Saenz, Esq.                James Scherr, Esq.
333 South Campo Street              Scherr, Legate & Ehrlich, PLLC
Las Cruces, New Mexico 88001        109 N. Oregon, 12th Floor
                                    El Paso, Texas 79901

**RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.**

By: _____
Charles J. Vigil